# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

PIERRE D. CROSBY,

                              Plaintiff,

        v.                                                       9:15-CV-1125
                                                       (BKS/ATB)

THOMAS LaVALLEY, et al.,

                              Defendants.

---

PIERRE D. CROSBY, Plaintiff pro se
JOHN MOORE, Asst. Attorney General for defendants

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report-Recommendation by the Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

    Plaintiff filed this civil rights complaint on September 17, 2015. (Dkt. No. 1). On November 16, 2015, after initial review, Judge Sannes dismissed some of plaintiff's claims and allowed others to go forward. (Dkt. No. 4). In the relevant portion of plaintiff's civil rights complaint, he alleges that he was the victim of a "retaliatory" use of excessive force in two separate, but related incidents which occurred on November 18, 2013, at the hands of defendants Martin, Pilon, Whalen, and Cross, while plaintiff was incarcerated at Clinton Correctional Facility ("Clinton") Annex. (Complaint ("Compl." ¶¶ 7-9)). Plaintiff also alleges that as a result of the November 18, 2013 incident, he was subjected to a "retaliatory" misbehavior report, and a disciplinary hearing by defendant Holdridge that did not comport with due process. (Compl. ¶¶ 10-

11).

The following claims survived Judge Sannes's initial review: (1) Eighth Amendment claims of excessive force against defendants Martin, Pilon, Stotler, Whalen, and Cross; (2) First Amendment retaliation claims against defendants Martin, Pilon, Whalen, and Stotler; (3) Fourteenth Amendment due process claims against defendants Holdridge and Fischer; and (4) supervisory claims against defendants LaValley and Fischer. (Dkt. No. 4 at 22).

Presently before the court is a motion for summary judgment filed on behalf of defendants Pilon, Stotler, and Martin as to Excessive Force claims; Pilon, Martin, Cross, Whalen, and Stotler as to First Amendment retaliation claims; all claims against defendants Fischer and LaValley; and any due process claims as against defendant Holdridge. (Dkt. No. 65, 65-12, Def.s' Mem. of Law at p.1-2).

## I.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

2

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## II.   Facts

In his complaint, plaintiff claims that on November 15, 2013, he filed a grievance against defendant Corrections Officer ("CO") Leonard Martin, alleging that defendant Martin threatened plaintiff with "serious physical harm" for filing "prior grievances."[1] (Compl. ¶ 7). Plaintiff has attached a copy of the November 15, 2013 grievance to his complaint as Exhibit A. (Compl. Ex. A) (Dkt. No. 1-1). This grievance states that, on November 15, 2013, plaintiff encountered defendant Martin on plaintiff's way back to his housing unit. (Compl. Ex. A). Plaintiff claims that defendant Martin stopped plaintiff and told him that "a lot of the other officers" thought plaintiff was "trouble"

---

[1] As discussed below, the November 15th grievance was never received by anyone at the Inmate Grievance Program, and the November 15th grievance does not appear on any of the grievance records that defendants have submitted as exhibits.

3

because of his previous grievances and Inspector General ("IG") investigation "on other officers at the facility." (*Id.*)  Plaintiff claimed that defendant Martin told plaintiff that if he did not stop filing grievances, "they" would put a stop to it "one way or another." (*Id.*)  Although defendant Martin told plaintiff that Martin had never had a problem with plaintiff when he was living in defendant Martin's dorm, the issue was "out of [defendant Martin's] hands."  Plaintiff states that he sent a copy of the November 15, 2013 grievance to defendants LaValley and Fischer. (*Id.*)

With the above facts as background, plaintiff then states that on November 18, 2013, defendants Martin and Pilon carried out defendant Martin's "threat" by assaulting plaintiff without cause or provocation, causing serious injuries to plaintiff's right eye and front tooth. (Compl. ¶ 8).  Plaintiff claims that defendants Martin and Pilon punched, kicked, stomped, and threw plaintiff face-first into the ground. (*Id.*)  Plaintiff states that defendants Stotler, Whalen, Pilon, and Holdridge falsified the "Use of Force" report and "to/froms."[2]  Plaintiff also claims that, as he was being escorted to the medical clinic after the above Use of Force incident, defendants Whalen and Cross assaulted the plaintiff "some more," causing additional pain and damage to plaintiff's right eye and vision. (Compl. ¶ 9).

Plaintiff states that on November 27, 2013, he filed "another" grievance against defendants Whalen and Cross to "fully exhaust his administrative remedies" relative to

---

[2] The term "to/from" is often used when referring to investigative or other memoranda sent between officers at correctional facilities.

the "second assault."[3] (Compl. ¶ 12 & Ex. E). As stated above, the exhibits to plaintiff's complaint include a copy of the grievance that plaintiff claims that he filed against defendant Martin, which allegedly resulted in the November 18th "retaliatory" assault. Plaintiff also includes a copy of the "appeals" that he claims that he sent to Superintendent LaValley (letter dated November 27, 2013) and to Karen Bellamy (letter dated December 2, 2013) after his November 15th grievance went "unanswered." (Pl.'s Ex. A at CM/ECF p.3-4).

Plaintiff alleges that , as a result of the November 18, 2013 Use of Force incident, he was served with a "retaliatory" misbehavior report, written by defendant Pilon, charging plaintiff with various rule violations,[4] in an effort to "cover up [the] retaliatory assault." (Compl. ¶ 10). Defendant Holdridge was assigned as the hearing officer to conduct plaintiff's Tier III hearing. (Compl. ¶ 11). Plaintiff claims that defendant Holdridge denied plaintiff due process by denying his request for "credible and [alibi] witnesses." (*Id.*) Defendant Holdridge found plaintiff guilty of all but one of the charges and sentenced him to five months in the Special Housing Unit ("SHU"), with loss of all privileges and good time credits.[5] Plaintiff appealed defendant Holdridge's

---

[3] There is clearly a typographical error in the complaint. Plaintiff states that he filed the "second" grievance on November 17, 2013, but he means November 27, 2013. November 17th is the day before the assault allegedly took place. In addition, the last sentence of the paragraph refers to the November 27th grievance. (Compl. ¶ 12 & Ex. E). The November 27th grievance was properly filed and received by the IGRC.

[4] Plaintiff was charged with violating a direct order, delaying the count, violent conduct, and interference. (Pl.'s Ex. C at CM/ECF p.26) (Inmate Misbehavior Report). Plaintiff was found "not guilty" of delaying the count. (Pl.'s Ex. C at CM/ECF p.28).

[5] On November 30, 2015, in accordance with this court's November 16, 2015 Order, plaintiff filed a waiver of all challenges to the duration of his confinement in accordance with *Peralta v. Vasquez*, 467 F.3d 98, 104 (2d Cir. 2006) so that his case could proceed on the remaining issues. (*See*

disposition, but the disposition was affirmed. (Compl. ¶ 13 & Ex. F).

The Use of Force Report, the Inmate Misbehavior Report, and the memoranda written by all the officers involved describe quite a different incident than alleged by plaintiff in his complaint. (Pl.'s Ex. C at CM/ECF p.19-23, 26). The Inmate Misbehavior Report is written by defendant Pilon. In the Misbehavior Report, defendant Pilon states that he responded to a "blue dot,"[6] and all the inmates present were given a direct order to be "'on the count.'"[7] (Pl.'s Ex. C at CM/ECF p.26). Defendant Pilon states that plaintiff was on the telephone and "refused to get off." Defendant Pilon gave plaintiff a direct order to get off the telephone, but he refused. Defendant Pilon gave plaintiff another direct order to hang up the telephone, and this time, the plaintiff "turned and stepped toward [Pilon] with a clenched fist." Defendant Pilon states that he "took Inmate Cosby to the floor with a body hold," but plaintiff continued to struggle until defendant Pilon was able to apply restraints. After the restraints were applied, defendant Pilon helped plaintiff to his feet. There was no further incident.

Plaintiff's exhibits also include a copy of the grievance that he filed regarding the November 18th incident itself. (Pl.'s Ex. E). Defendants have submitted the grievance that plaintiff actually filed and which is stamped "received" by the IGP of Clinton

---

Dkt. Nos. 4-6).

[6] A "blue dot" is an alarm indicating that an officer needs assistance in a particular area. The "blue dot" in this case was not related to the plaintiff. The officers were attempting to gain control of another inmate.

[7] The misbehavior report states that there were 59 inmates in the building at the time of the incident.

Annex on December 12, 2013. (Bellamy Decl. Ex. B at BN 286-87).[8]  The

Superintendent's response, the action of the CORC, the memoranda written by the

officers involved, the investigative documents, and plaintiff's medical records are all

included in the defendants' exhibit. (*Id.* at BN 283-307).

## III.    Exhaustion of Administrative Remedies

### A.    Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an

inmate to exhaust all available administrative remedies prior to bringing a federal civil

rights action.  The exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and regardless of the

subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004)

(citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their

administrative remedies even if they are seeking only money damages that are not

available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the

defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d

691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to

establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v.

Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's

---

[8] Where the defendants' exhibits contain Bates-stamps, the court will cite to the Bates-stamped number ("BN") to identify the pages in defendants' exhibits because it will be easier for plaintiff to locate.

administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id.* § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.  Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v.*

*Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at *2. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

### B.    Application

#### 1.    Excessive Force

Defendants argue that plaintiff's excessive force claims against defendants Pilon, Stotler and Martin, any claim of excessive force at the medical clinic, and all retaliation claims must be dismissed for failure to exhaust administrative remedies. (Def.s' Mem. at 1, 4-10).  Defendants argue that, although plaintiff filed a grievance on December 12, 2013,[9] regarding the November 18, 2013 incident, plaintiff never alleged in that grievance that he was assaulted by defendants Pilon, Stotler, or Martin.  Nor did plaintiff allege in his December 12th grievance that he was assaulted at the medical clinic. (*Id.* at 8).

Proper exhaustion includes bringing grievances in accordance with the applicable procedural rules.  In New York, a grievant is not required to identify the parties against whom he is grieving, but he is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) (citing N.Y. Comp. Codes R. & Regs., tit. 7 § 701.7 (a)(1)).[10]  The PLRA's exhaustion requirement requires that prison officials be afforded the time and opportunity to address a complaint internally.  "In order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive

---

[9] The grievance is dated November 27, 2013, but the IGP "Received" stamp on the document is dated December 12, 2013.

[10] The current rule appears at 7 NYCRR § 701.5(a) - "In addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem . . . ."  This rule applies to claims of employee harassment. *See* 7 NYCRR § 701.8(a) (citing § 701.5(a)).

10

measures." *Johnson*, 380 F.3d at 697 (finding the PLRA exhaustion requirement was "not dissimilar to the rules of notice pleading"). Therefore, the question for the court here is "whether [the] plaintiff's grievance sufficiently alerted the prison officials that he was alleging some wrongdoing beyond that alleged against the individual or individuals specifically named in the grievance." *Peele v. Donah*, No. 9:15-CV-317, 2016 WL 4400473, at *5 (N.D.N.Y. June 14, 2016) (citation omitted).

Although it is true that this plaintiff did not name all the defendants in his grievance, it is clear that the prison officials were well-aware of the incident that plaintiff described in his November 27, 2013 grievance. On December 12, 2013, the Superintendent referred the plaintiff's "Harassment Grievance" to defendant Holdridge for a full investigation of the matter. (Brousseau[11] Decl. ¶ 5 & Ex. B, BN 258) (Dkt. No. 65-2). Defendant Holdridge was also the hearing officer at plaintiff's disciplinary hearing which resulted from the November 18, 2013 incident.

In the grievance materials, there is an email from defendant Holdridge to Superintendent LaValley, with a copy to Deputy Superintendent Stephen Brown and Lieutenant Michael Blaine, dated Friday November 29, 2013. (Brousseau Decl. Ex. B, BN 273). The email states that plaintiff alleged, during his Tier III hearing, that the November 18, 2013 incident "was not accurate as reported." (*Id.*) Defendant Holdridge then repeats the incident as plaintiff described it, including plaintiff's claim that he was

---

[11] Tara Brousseau is the Inmate Grievance Program Supervisor at Clinton Annex. (Brousseau Decl. ¶ 1).

hit again while he was in the clinic by defendant Whalen (not defendant Stotler).[12] (*Id.*) Defendant Holdridge noted that "[d]ocumentation indicates that Officer T. Rocque escorted inmate Cosby from 40-1 building to the clinic and then to 11a1. The 11a1 log book that was read into the hearing record reflects inmate Cosby was escorted to 11a1 by CO M. Cross and Sergeant Whalen." (*Id.*) Defendant Holdridge stated that he was directing Lieutenant Blaine to "investigate the allegations to include inmate and employee interviews with written responses to the allegations and discrepancies in the paperwork." (*Id.*)

The grievance investigation contained reports from all of the defendants, including defendants Whalen,[13] Pilon,[14] Stotler,[15] Cross,[16] and Martin.[17] The grievance materials and accompanying investigation also included reports from the nurse, who took care of plaintiff in the clinic, who stated that he did not see plaintiff struck by "any staff member on 11/18/13." (Brousseau Decl. Ex. B, BN 278). The investigation also included a statement from C. Voorhees, clarifying the error he made in his logbook entry for November 18, 2013. (*Id.* BN 279). C. Voorhees states that he did not actually witness plaintiff's escort from the clinic to his cell. Voorhees states that after the

---

[12] The complaint never mentions plaintiff being assaulted at the clinic in front of Nurse Damour. The complaint alleges that the second assault occurred "en route" to the clinic. (Compl. ¶ 9).

[13] (Brousseau Decl. Ex. B, BN 274).

[14] (Brousseau Dec. Ex. B, BN 243).

[15] (Stotler Decl. Ex. B).

[16] (Brousseau Decl. Ex. B, BN 277).

[17] (Brousseau Decl. Ex. B, BN 276).

inmate was secured, he "saw Sgt. Whalen and CO M. Cross enter my office area," so Voorhees assumed that CO Cross had escorted plaintiff, when actually, CO Rocque was the escort and had left the unit. (*Id.*)  The erroneous logbook entry has also been included with the materials. (*Id.* BN 281).  Plaintiff's grievance alleged that defendants Whalen and Cross had escorted him to the Clinic, which was consistent with the logbook entry, but inconsistent with the evidence presented at plaintiff's disciplinary hearing and inconsistent with the officers' statements, indicating that Rocque was the plaintiff's escort to the clinic, and Cross and Rocque escorted plaintiff from the clinic to the housing unit. (*Id.* BN 275, 277).

Over the course of this case, plaintiff has given different accounts of the November 18th incident, including which of the defendants was responsible for the alleged conduct, making the exhaustion analysis a little more complicated.  The complaint itself does not allege that defendant Stotler "assaulted" plaintiff. (Compl. ¶ 8).  In his complaint, plaintiff states that "defendants Stotler, Whalen, Pilon and Holdridge retaliatory [sic] falsified use of force and to/froms[]."[18]  During his deposition, plaintiff testified that he did not even remember defendant Stotler. (Pl.'s Dep. at 43) (Dkt. No. 65-11).  Plaintiff testified that Stotler was "named as a Defendant because of . . . the misbehavior report, and the to and from reports, and the unusual incident reports . . . ." (*Id.*)  However, shortly thereafter, plaintiff testified that defendant Stotler struck plaintiff in the infirmary, and asked plaintiff if it "hurt." (Pl.'s Dep. at 46).  Plaintiff has not amended his complaint to make any such claim against

---

[18] Defendant Stotler, a Corrections Sergeant, signed the Use of Force Report. (Stotler Decl. ¶ 2 & Ex. A).

defendant Stotler, and during plaintiff's disciplinary hearing, he stated that the individual who hit him in the infirmary was defendant Whalen. (Holdridge Decl. Ex. B at 10-11, BN 105-106).

It is clear from the volume of information regarding this incident, that plaintiff has exhausted his administrative remedies as to all defendants, even if he did not name some of them in the grievance. The incident was investigated as part of the grievance process and as part of the related disciplinary hearing. Defendant Holdridge referred the incident to Lieutenant Blaine for investigation after the disciplinary hearing and referred the case to the Inspector General's Office for further investigation,[19] as is the appropriate procedure in certain cases of Employee Harassment Grievances.[20] This included the alleged use of force at the telephone, in the hallway, and in the clinic.[21] Plaintiff appealed this grievance to the CORC, thus, properly completing the grievance process and exhausting his administrative remedies.

### 2.    Retaliation

Plaintiff's claims of a retaliation against defendants Martin, Pilon, Cross, Whalen, and Stotler have not been exhausted.[22] Plaintiff uses the word "retaliation" or

---

[19] The record does not contain any reports or documents specifically from the Inspector General's investigation.

[20] In his declaration, defendant Holdridge states that, because of plaintiff's allegations during the disciplinary hearing, defendant Holdridge "ordered an investigation." (Holdridge Decl. ¶ 31).

[21] The court is not implying or finding that additional force was used beyond the Use of Force Report filed by the defendants. However, the defendants were certainly on notice, and had plenty of opportunity to investigate the entire incident, fulfilling the purpose of the exhaustion requirement.

[22] The court would point out that if plaintiff's assault was found to be excessive force, the defendants' alleged retaliatory motive would be irrelevant. The case would still proceed on the excessive force claim. Plaintiff's claim of retaliation against defendant LaValley was dismissed sua

"retaliatory" to describe almost every statement in his complaint. Plaintiff claims that the assaults were retaliatory, the misconduct report was retaliatory, that the appointment of defendant Holdridge as the hearing officer was "retaliatory," and that the disciplinary sentence was retaliatory. (Compl. ¶¶ 8-11). Nowhere in all the documents, disciplinary hearing transcript, memoranda, or grievance materials does plaintiff allege that the use of force (whichever way it occurred) was in retaliation for a grievance that he allegedly filed against defendant Martin on November 15, 2013, just three days prior to the November 18, 2013 incident, and of which there is no record of receipt by the grievance department. During his disciplinary hearing, plaintiff claimed that the misbehavior report was "fabricated," but there was no reason associated with this alleged "fabrication." (Holdridge Decl. Ex. B) (Hearing Transcript ("HT") at 31).

The only place where retaliation is mentioned, and plaintiff may claim that this fulfills his exhaustion requirement, is in plaintiff's alleged appeal of the November 15, 2013 grievance, wherein he mentions that "Enclosed please find a copy of the unremedy [sic] 11/15/13 Grievance against C.O. Martin, who on 11/18/13 retaliatory assault on me. Please remedy this matter." (Dkt. No. 1-1 at 3). However, even if plaintiff had actually filed this "appeal," his brief mention of the November 18, 2013 incident as "retaliatory" does not satisfy the exhaustion requirement as to any claims of retaliation. Thus, to the extent that the complaint asserts separates claims of "retaliation," such claims may be dismissed for failure to exhaust. In any event, as discussed below, plaintiff's retaliation claims fail on the merits.

---

sponte in Judge Sannes's initial order. (Dkt. No. 4 at 2).

## IV.    Retaliation

### A.    Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

### B.    Application

As stated above, the complaint is littered with the words "retaliation" and "retaliatory." Plaintiff claims that the alleged use of force/assault was in retaliation for a grievance that he filed against defendant Martin three days prior to the November 18, 2013 incident. The grievance that plaintiff claims he filed on November 15, 2013 states that plaintiff was stopped by defendant Martin on November 15th, and Martin told plaintiff that "a lot of other officer's [sic] say that I'm trouble because of my previous

grievances and IG investigation on other officers at the facility." (Dkt. No. 1-1 at 2). The grievance also states that defendant Martin told plaintiff that he was becoming a problem for the administration, and if he did not "stop doing what [he] was doing," they would put a stop to him one way or another. (*Id.*)  Plaintiff then stated that he had never had a problem with Martin before. (*Id.*)

This alleged grievance was not stamped "received" by the grievance department, and plaintiff claims that he never received a response.  Plaintiff has attached a letter that he allegedly wrote to Superintendent LaValley, "appealing" the failure of the IGRC to respond to plaintiff's November 15, 2013 grievance against defendant Martin, who "on 11/18/13 retaliatory assault on me [sic]." (Dkt. No. 1-1 at 3).  Plaintiff has also included the "appeal" letter that he allegedly wrote to Karen Bellamy of the CORC, appealing the alleged failure of defendant LaValley to respond to the previous "appeal." (Dkt. No. 1-1 at 4).

There is absolutely no indication that any defendant, including defendant Martin, knew about the grievance that plaintiff "filed" on November 15, 2013.  At his deposition, plaintiff conceded that he had "no idea" whether Sergeant Stotler knew of defendant Martin's alleged threat or any prior grievances filed by plaintiff. (Dkt. No. 65-11, Pl.'s Dep. at 47).  Plaintiff also conceded that he did not know whether defendants Cross or Whalen knew of defendant Martin's alleged threats or of plaintiff's prior grievances. (*Id.* at 49-50).  At plaintiff's disciplinary hearing, in answer to an unrelated question from defendant Holdridge, defendant Pilon testified that he did not even know Officer Martin because they did not usually work in the same area of the

17

prison. (Dkt. No. 65-5, HT at 91).

With respect to alleged "prior grievances," the court would note that the first grievance that plaintiff appealed all the way to the CORC was the grievance regarding the November 18, 2013 incident. (Bellamy Decl. Ex. A). The only other grievance which plaintiff appealed to the CORC is dated **2007**, and it was filed at different correctional facility. (*Id.*) A review of plaintiff's filed grievances in general[23] indicates that, prior to November of 2013, plaintiff filed a grievance in April of 2012, complaining that his mail was not sent out. (Brousseau Decl. Ex. A). Thus, it is unclear why defendant Martin would have threatened plaintiff on November 15, 2013 about his grievance activity, when it does not appear that there were any grievances filed by plaintiff that were appealed to the CORC prior to November of 2013, and there was only one other grievance filed by plaintiff in 2012 about his mail. In fact, a review of the grievance that plaintiff says he filed on November 15, 2013 states that he had never had problems with defendant Martin before November 15th.

Defendants have shown that there is no question of fact regarding any claim of retaliation by plaintiff, and thus, even if the court were to find that plaintiff exhausted his administrative remedies as to this claim, it would fail on the merits. This includes all retaliation claims against all defendants, including plaintiff's claim that defendant Pilon issued a retaliatory misbehavior report.

V.    **Excessive Force**

    A.    **Legal Standards**

---

[23] These include grievances that were filed, but not appealed to the CORC.

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must establish the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citing *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999)). However, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The Supreme Court has recently re-emphasized that the "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather whether

19

the force was applied in a good faith effort to restore discipline, or whether it was applied maliciously to cause harm, regardless of the seriousness of the injury. *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam).

In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003). The extent of the injury may be considered as one factor in determining whether the use of force could plausibly have been thought "necessary" in a particular situation. *Wilkins v. Gaddy*, 559 U.S. 37-38, 40. The extent of the injury may also give some indication of the amount of force applied and may ultimately be considered in determining damages if appropriate. *Id.*

## B.    Application - Defendant Martin

In the complaint, plaintiff states that defendants "Martin and Pilon . . . assaulted Plaintiff without cause or any provoking, causing serious physical injuries to Plaintiff's right eye and front tooth . . . by punching, kicking, stomping and throwing him face first into the ground[.]" (Compl. ¶ 8). Plaintiff's grievance, based on the same incident alleged that Officer Martin grabbed plaintiff "and shoved him into the hands of Correction Officer . . . Cross," who placed plaintiff's hands behind his back using no restraints and escorted him to a hallway outside of 41 building, and it was then that

Cross "started assaulting [plaintiff] with forceful punches to [plaintiff's] head, face, and mouth." (Dkt. No. 65-1 at B. 286).

At plaintiff's deposition, plaintiff testified that Martin ordered plaintiff to get off the telephone (Pl.'s Dep. at 61-62), and then pushed him into the hands of defendant Cross (Pl.'s Dep. at 64, 66). Plaintiff stated that he was pushed in the same direction that he was already walking. (Pl.'s Dep. at 66-67). Plaintiff stated that "once Martin pushed me, he pushed me into the hands of Cross. Cross escorted me out [sic] the building, inside the hallway." (Pl.'s Dep. at 67). Plaintiff testified that no one had hit plaintiff before he and Cross got to the hallway, and the entire first alleged assault happened in the hallway. There was no kicking or "stomping" prior to this point. (*Id.*) Plaintiff specifically stated that defendant Martin did not proceed with plaintiff to the stairwell, and that no one had hit plaintiff at that point. (Pl.'s Dep. at 69). Martin did not accompany plaintiff to the hallway where plaintiff claims that the first assault took place. (Pl.'s Dep. at 70-71). Plaintiff testified that "other than his push," Martin did not strike plaintiff at all. "He just pushed me real violent – real hard in Cross' hands." (Pl.'s Dep. at 72, 74).

At plaintiff's disciplinary hearing, he testified that defendant Martin grabbed plaintiff and pushed him in front of Officer Rocque, and that Rocque took plaintiff into the hallway, where he applied the restraints and began assaulting plaintiff.[24] Although plaintiff alleged during his disciplinary hearing that there were "other officers" that he

---

[24] As stated above, it turned out that plaintiff was mistaken about the identity of Officer Rocque, and that defendant Cross is now the individual who plaintiff claims assaulted him in the hallway.

did not know, he never mentioned defendant Martin as one of the officers who hit him or who was even present when he was being hit. (Dkt. No. 65-11 at 10, B. 105-106).

Thus, it appears that plaintiff's more recent and more consistent allegations against defendant Martin involve - at worst - "a violent push" by defendant Martin into the arms of defendant Cross, who then took plaintiff out into the hallway and allegedly assaulted him with the help of other officers.  Plaintiff steadfastly maintained at his deposition that defendant Martin was not in the hallway when plaintiff was assaulted, Martin did not hit plaintiff, and there is no indication other than plaintiff's conclusory claims of "retaliation" that Martin knew what was going to happen to plaintiff.[25]

A "push," even a "violent push" does not satisfy the objective element of the constitutional standard. *See Sims v. Artuz*, 230 F3d 14, 22 (2d Cir. 2000) (not every push or shove, even if it may later seem unnecessary, violates a prisoner's constitutional rights) (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). The Eighth Amendment prohibition against cruel and unusual punishment does not extend to de minimis uses of force, provided that the force is not "repugnant to the conscience of mankind." *Id.* (quoting *Hudson*, 503 U.S. at 10).  Based on plaintiff's own description of the incident at his disciplinary hearing, in his grievance, and at his deposition, defendant Martin was not involved in any excessive force against plaintiff. Thus, the complaint may be dismissed as against defendant Martin.

## VI.    Due Process

---

[25] The court must keep in mind that these facts are plaintiff's own allegations which are completely different from the defendants' version of the events of November 18, 2013.  Even in the defendants' version, defendant Martin was not involved in the actual use of force, which according to defendants occurred right in front of the telephones.

### 1.    Legal Standards

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The due process protections afforded inmates facing disciplinary hearings that are found to affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (*citing, inter alia, Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id*. (*citing, inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

### B.    Application

In this case, it is undisputed that plaintiff had a liberty interest protected by the

due process clause.  The issue is whether plaintiff received the requisite procedural due process protections at his disciplinary hearing.  Defendant Holdridge was the hearing officer at his disciplinary hearing.  Plaintiff alleges that defendant Holdridge denied "Plaintiff's request for 'credible and alibi witnesses . . ." so that Holdridge could impose a "retaliatory" sentence. (Compl. ¶ 11).  Plaintiff also appears to allege that defendant LaValley appointed defendant Holdridge as the hearing officer, even though Holdridge was the "top investigating official" of the November 18, 2013 incident. (*Id.*)

### 1.    Witnesses

Plaintiff's November 19, 2013 Misbehavior Report, written by defendant Pilon, charged plaintiff with violating a direct order; interference; delaying the count; and violent conduct. (Holdridge Decl. ¶ 7 & Ex. A at 64).  Plaintiff received notice of the charges and was provided the assistant of his choosing from an Assistant Selection Form, which plaintiff completed and signed on November 19, 2013.[26] (Holdridge Decl. ¶¶ 9-11 & Ex. A at 64, 80).

After meeting with plaintiff on November 21, 2013, plaintiff's assistant completed the "Assistant Form," which indicates all the witnesses and evidence plaintiff requested, and whether the evidence was provided to him. (Holdridge Decl. Ex. A at 81).  B. Cronin signed the completed form on November 22, 2013. (*Id.*) Plaintiff requested four inmate witnesses, three of whom testified at the disciplinary

---

[26] The Assistance Selection Form contains thirteen officers' names (one name has been crossed out), from which the inmate is asked to choose three in the order of his preference. (Holdridge Decl. Ex. A at 80).  Plaintiff was assigned his first choice for assistant - B. Cronin. (*Id.*)

hearing - Womack, Torres, and Nicholson.[27]  In addition to the three inmates requested prior to the hearing, plaintiff was allowed to call Inmate Grant, the individual who was on the telephone at the time of the incident, and Inmate West, another inmate who was in one of the cells at the time of the November 18th incident. (Holdridge Decl. Ex. A at 158-61, 164-68).  Plaintiff also was allowed to call his girlfriend as a witness.  She was on the telephone with him at the time of the incident.

Defendant Holdridge also heard testimony from Nurse Damour, who took care of plaintiff in the infirmary after the use of force; defendants Martin, Cross, Pilon, and Whalen; Officer Rocque; Officer Provost; and Officer Cooper.  Near the end of the hearing, plaintiff asked for another inmate witness, but could not remember the name, so he first stated that he wished to call the inmate in "fourteen cube." (Holdridge Decl. Ex. B, Hearing Transcript ("HT") at 88, BN 183).  Then plaintiff stated that the inmate was in "Seventeen cube." (*Id.*)  Defendant Holdridge pointed out that there had been "plenty of inmate testimony," and that some of the inmates' testimony was consistent with plaintiff's version of the incident, so he would not need additional support. (*Id.*)  Plaintiff agreed that the last inmate's testimony would be the "same as four of five [witnesses] previously provided." (Holdridge Decl. Ex. A, BN 65). Defendant Holdridge then stated that "if" he denied the witness, plaintiff would get it in writing. (*Id.* at 89, BN at 184).  On December 2, 2013, defendant Holdridge signed a Witness Interview Notice, denying plaintiff's final requested witness because the testimony

---

[27] The fourth inmate witness listed on the form - Castilano - refused to testify. (Holdridge Decl. Ex. A at 81).  The refusal form, signed by Inmate Castilano is included in the hearing materials. (*Id.* at 83).

would have been "redundant." (Holdridge Decl. Ex. A, BN 65).

Based on the above, it is clear that plaintiff was not improperly denied any witnesses. Plaintiff requested multiple witnesses testify, and all but two of them testified. Some of his own inmate witnesses testified contrary to plaintiff's version of the events. Inmate West appeared to change his testimony mid-stream, first alleging that he did not see anything,[28] then stating he saw the officers hit plaintiff by the telephones, and then, based on plaintiff's leading questions, Inmate West testified that he never saw plaintiff go to the floor.[29] Nurse Damour testified that he never saw anyone hit plaintiff in front of him at the infirmary, even though in plaintiff's version of the incident, he was assaulted again in front of the nurse. An inmate's right to present witnesses and evidence is not unlimited and may be denied for "irrelevance, lack of necessity, and other hazards particular to each case." *Haigler v. Chappius*, No. 15-CV-780, 2017 WL 5177722, at *7 (W.D.N.Y. Nov. 8, 2017) (citing *Phelan v. Superintendent of the Great Meadow Corr. Facility*, 2012 WL 1190169, at *6 (W.D.N.Y. Apr. 9, 2012)). *See also Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (refusal to call witnesses whose testimony would be redundant is not a due process violation). Defendant Holdridge's denial of one inmate witness as redundant, when five other inmates and multiple corrections officers testified at plaintiff's request was not a

---

[28] (HT at 69, BN 164).

[29] (HT at 72-73, BN 187-88). Plaintiff's version of the incident states that the first assault happened in the hallway, not by the telephones. Thus, to be consistent with plaintiff's statement of the facts, Inmate West would have needed to testify that he did not see anyone hit plaintiff, but rather that plaintiff was pushed into the arms of a defendant, who then escorted plaintiff out of the room and into the hallway, where he was subsequently assaulted.

denial of due process. The issue was one of credibility, and defendant Holdridge resolved it against plaintiff.

### 2.    Impartial Hearing Officer

Due process requires that prison disciplinary hearings be conducted by a hearing officer who is fair and impartial. *Shabazz v. Bezio*, 669 F. App'x 592, 593 (2d Cir. 2016) (citing *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999). However, because of the "special characteristics" of the prison environment, the degree of impartiality required of prison officials does not rise to the level of that required of judges generally. *Id.* (citing *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). In addition, due process requires that the hearing officer's findings be supported by "some 'reliable evidence of the inmate's guilt.'" *Id.* (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004)).

In this case, plaintiff seems to claim that defendant Holdridge was not impartial because he was the "top investigating official of the 11/18/13 retaliatory assault." (Compl. ¶ 11). However, the investigation that defendant Holdridge began resulted from plaintiff's testimony that the incident did not occur "as reported." Because plaintiff testified that the officers assaulted him, defendant Holdridge determined that he would have an investigation conducted. In an email, Holdridge directed that Lt. Blaine conduct the investigation into the matter. (Holdridge Decl. Ex. C, B. 219). Holdridge was not involved in the investigation that resulted in the charges themselves, and he directed Lt. Blaine to conduct the investigation and obtain statements after the hearing began. (Holdridge Decl. ¶¶ 31-32 & Ex. C, B. at 219, 220-25). In any event,

the court in *Shabazz* held that "[s]tanding alone, the fact that [the hearing officer] both heard the case and participated in its investigation is not a conflict 'of sufficient magnitude to violate due process.'" 669 F.3d at 593 (citing *Francis*, 891 F.2d at 46).

At the end of the hearing, defendant Holdridge read his disposition and the facts upon which he based the disposition into the record. (*Id.* at 107-108, BT at 202-203). After a review of all the testimony, this court finds that defendant Holdridge based his guilty finding on constitutionally sufficient evidence. There was certainly "some reliable evidence" that the incident happened as the officers testified. The evidence in support of the officers' testimony included some of plaintiff's own witnesses, who testified contrary to plaintiff's version of the event, that plaintiff was taken down immediately, rather than assaulted outside of the telephone area. In addition, Nurse Damour testified that he did not see anyone hit plaintiff in the infirmary. In addition, defendant Holdridge found plaintiff not guilty of one of the charges,[30] which is further evidence that he was impartial. *See Shabazz*, *supra*.

## VII. **Respondeat Superior**

### A. **Legal Standards**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to

---

[30] Plaintiff was found not guilty of delaying the count. (Dkt. No. 65-11 at 37).

individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second

29

Circuit).

### B.    Application

Plaintiff has named Brian Fischer, former Commissioner of the Department of Corrections and Community Supervision ("DOCCS"). (Fischer Decl. ¶ 3).  In his declaration, defendant Fischer states that he retired in 2013, and his last day of work was April 30, 2013. (*Id.*)  Because defendant Fischer's last day of work was in April of 2013, he could not have been personally involved in reviewing the results of plaintiff's disciplinary appeal based on an incident which occurred on November 18, 2013.  Thus, the case must be dismissed in its entirety as against defendant Fischer.

Plaintiff has also named Superintendent LaValley.  Plaintiff alleges that defendant LaValley appointed defendant Holdridge as the hearing officer.  To the extent that plaintiff claimed that this action was "retaliatory," the claim was dismissed in Judge Sannes's initial order.  Plaintiff also alleges that defendant LaValley participated with defendant Fischer and the rest of the defendants to "cover up" the "racially motivated and retaliatory assault" on plaintiff. (Compl. ¶ 18).  Plaintiff mentions the "creation of a policy or custom" to cover up the defendants' "criminal behavior." (*Id.*)  Judge Sannes dismissed any claims that the assault was "racially motivated, and there is absolutely no factual basis for the conclusory statement that defendant LaValley acted with anyone to "cover up" any improper actions by the defendants.  Thus, the complaint may be dismissed in its entirety as against defendant LaValley.[31]

---

[31] If the court adopts this recommendation, the only remaining claims will be the Eighth Amendment excessive force claims as against defendants Pilon, Stotler, Whalen, and Cross.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the motion for summary judgment (Dkt. No. 65) be GRANTED, and the complaint **DISMISSED IN ITS ENTIRETY AS TO DEFENDANTS FISCHER, LAVALLEY, MARTIN, AND HOLDRIDGE**, and it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 65) be **GRANTED WITH RESPECT TO CLAIMS OF RETALIATION AS AGAINST ALL DEFENDANTS**, and it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 65) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 15, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge